IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

CRYSTAL BONNEAU                                        PLAINTIFF

v.                  NO. 3:20-cv-00095 PSH

ANDREW SAUL, Commissioner of                      DEFENDANT
the Social Security Administration

## MEMORANDUM OPINION AND ORDER

In this case, plaintiff Crystal Bonneau ("Bonneau") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Bonneau offers several reasons why, one of which has merit. Bonneau maintains, and the Court agrees, that the ALJ failed to fully explain why the medical opinions of Dr. Russell DiPonio, M.D., ("DiPonio") are unpersuasive.

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) [quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)].

The record reflects that Bonneau has a history of a back impairment. X-rays of her thoracic spine taken before the alleged onset date showed degenerative disc disease and compressions at several vertebrae. See Transcript at 369, 379-380. X-rays of her lumbar spine taken before the alleged onset date showed lumbar scoliosis, degenerative disc disease, and compressions at several vertebrae. See Transcript at 370, 381-382.

On August 20, 2015, or two days after the alleged onset date, Bonneau saw DiPonio for complaints of left knee pain made worse with bending. See Transcript at 406-407. Bonneau stood five feet, eight inches tall and weighed 378 pounds. She had tenderness just below the patella of her left knee. DiPonio's diagnoses included osteoarthritis of the left leg and morbid obesity. He continued her on medication that included Voltaren and recommended she see Dr. John Ball, M.D., ("Ball").

Bonneau saw Ball on September 24, 2015. See Transcript at 351-354. Bonneau's chief complaint was recorded to be as follows:

> [Bonneau] ... is seen ... with ... [complaints of] [right] ankle and [left] knee [pain]. She indicates she twisted her knee about a year ago, and has been having catching and popping. She has also had some clicking in the [right] ankle, but it does not seem to be associated with pain. She had some [x-rays] done here about a year ago, and, at that time, she had a moderate level of arthritis in the knee, but she feels her symptoms have gotten quite a bit worse since then.

2

See Transcript at 351. Bonneau weighed 373 pounds. X-rays of her left knee showed spurs and mild lateral joint narrowing, but Ball observed that Bonneau was "still maintaining pretty good motion in her knees." See Transcript at 352. Ball diagnosed left knee arthritis and proposed the following treatment plan:

> [Bonneau] likely has some rough cartilages causing the popping. The next level of treatment, beyond the anti-inflammatory, would be to do an injection into the knee, and she defers that. We are going to expect this problem to gradually worsen as long as she is putting the same amount of stress on her knee from her morbid obesity.

See Transcript at 353.

On December 8, 2016, Bonneau saw DiPonio for, inter alia, worsening back pain. See Transcript at 607-611. Bonneau's chief complaint was recorded to be as follows:

> ... [History of] chronic back pain secondary to [osteoarthritis] and has been on [V]oltaren which lately has not been as effective although works well for her knees. [She] used to be on [M]obic which no longer helped. [History of] compression [fracture] T4, T6, [and] T7 secondary to [a motor vehicle accident]. [She] stated [one] month ago she turned the wrong way and since then has had increased pain [r]ight upper back. Pain worse when standing to do dishes.

See Transcript at 607. Bonneau weighed 376 pounds. She had tenderness upon palpation at T6-T7, T10-T12, and L3-L5 but had a normal gait and was able to stand without difficulty. DiPonio assessed, inter alia, a lumbar strain, a compression fracture of the thoracic vertebra, and osteoarthritis of the thoracic and lumbar spines. He administered a Toradol injection, continued her on medication that included Voltaren, prescribed medication that included Tramadol, and ordered diagnostic testing.

Imaging of Bonneau's thoracic and lumbar spines was performed on January 9, 2017. See Transcript at 475-476. The thoracic spine series showed no new acute bony changes, and the multiple levels of compression were stable when compared with a CT scan from 2012. The lumbar spine series showed no acute bony injury, and the T12 upper endplate compression fracture had a stable appearance when compared with a CT scan from 2012.

DiPonio referred Bonneau to Dr. Lakshman Gollapalli, M.D., ("Gollapalli"), who saw Bonneau on March 6, 2017. See Transcript at 928-931. Bonneau reported that she had been experiencing constant back pain with intermittent flare ups for several years. The pain was made worse by activities that included standing, walking, and increased movement. She weighed 365 pounds. She had an antalgic gait and station but was able to

heel walk and toe walk. Palpation of her thoracic facet joints at T11 and T12 reproduced pain, as did midline palpation and percussion of the mid-thoracic spine. Hyperextension at the thoracic spine also reproduced pain. A bilateral straight leg raise test was positive. Gollapalli started, or continued, Bonneau on medication that included Tramadol and ordered a thoracic MRI.

Imaging of Bonneau's thoracic spine was performed on March 29, 2017. See Transcript at 482-483. The imaging showed old compression fractures at several points. There was a minimal disc-spur complex at multiple levels, and a small central disc protrusion at C5-C6.

Bonneau saw Gollapalli again on April 3, 2017. See Transcript at 915-918. At the presentation, he recommended thoracic medial branch blocks.

On April 21, 2017, Bonneau saw Dr. Jeffrey Angel, M.D., ("Angel") for an osteoporosis evaluation. See Transcript at 526-531. Bonneau weighed 365 pounds. She had a full range of motion in her thoracic spine, and her muscle strength and tone in her lumbar spine were within normal limits. Angel diagnosed severe, morbid obesity and advised weight loss.

Bonneau returned to see Gollapalli on April 27, 2017. See Transcript at 913-914. At the presentation, Bonneau received thoracic medial branch blocks at T9-10, T10-11, and T11-12.

Bonneau saw Gollapalli again on July 24, 2017. See Transcript at 909-912. Bonneau reported that the thoracic medial branch blocks were extremely helpful, having improved her ability to perform daily activities.

Bonneau saw Gollapalli on August 22, 2017. See Transcript at 907-908. At the presentation, Bonneau received another round of thoracic medial branch blocks at T9-10, T10-11, and T11-12.

On September 13, 2017, Bonneau saw Gollapalli. See Transcript at 903-906. Bonneau again reported that the thoracic medial branch blocks were extremely helpful, having improved her ability to perform daily activities.

Bonneau saw Gollapalli next on October 3, 2017. See Transcript at 1081-1082. At the presentation, Bonneau received thoracic and lumbar medical branch nerve neurotomy treatment.

On October 28, 2017, Bonneau saw Dr. Bennett Battle, M.D, ("Battle") for back and knee pain. See Transcript at 935-938. Bonneau reported that she was in constant pain, could not lift heavy objects, and could only walk about one block. She weighed 374 pounds. Bennett noted that it was difficult to assess Bonneau's "knee range of motion due to obesity, but [there were] no significant limitations." See Transcript at 937. X-rays of her back and left knee were taken and showed the following:

> Lumbar spine (2 views): Complete loss of the T11-12 and T12-L1 disc spaces. Moderate disc height loss at L1-2 and L5-S1. Moderate facet degeneration. Impression: Moderate degenerative changes of the lumbar spine.
>
> Left knee (3 views): Mild narrowing of the lateral compartment with moderate osteophytosis. No fracture or malalignment. Impression: Mild degenerative changes of the left knee.

See Transcript at 937. Battle's diagnoses included moderate degenerative changes of the lumbar spine and mild degenerative changes of the left knee. Battle opined that Bonneau should be able to lift/carry up to twenty-five pounds and walk, stand, and sit for a full workday with normal breaks.

On March 12, 2018, DiPonio completed a medical source statement on behalf of Bonneau. See Transcript at 1006-1007. In the statement, DiPonio opined, inter alia, that Bonneau can occasionally lift and carry a maximum of ten pounds, stand and walk for thirty minutes, and sit for two hours. She can never climb, balance, stoop, kneel, crouch, or bend. On average, her impairments and/or treatment would cause her to miss two weeks of work per month. DiPonio based his opinions on Bonneau's "morbid obesity resulting in poor exercise tolerance, shortness of breath [and] chronic back pain due to poor physical condition, with deconditioned state due to extreme excessive weight." See Transcript at 1007.

Bonneau completed a series of documents in connection with her applications for disability insurance benefits and supplemental security income payments. See Transcript at 258-275, 278-287. In the documents, she represented, inter alia, that she suffers from constant and severe neck, back, and knee pain. She can stand/walk for only about five to ten minutes at a time and can sit for only about ten to twenty minutes at a time. She can attend to her own personal care, attend to the care of her pets, perform some housework, drive an automobile, and shop. She enjoys activities that include watching television and going to movies.

The ALJ found at step two of the sequential evaluation process that Bonneau's severe impairments include "back pain secondary to a history of compression fractures at T4, T5, T7, and T12 ...," "left knee pain secondary to mild narrowing of the lateral component with moderate osteophytosis ...;" and obesity. See Transcript at 14. The ALJ assessed Bonneau's residual functional capacity and found that she is capable of performing sedentary work with the following additional physical limitations: "... [she] could occasionally stoop, kneel, crouch or crawl." See Transcript at 17. As a part of making the assessment, the ALJ found DiPonio's medical opinions unpersuasive. The ALJ gave the following reasons for so finding:

> ... First, I find that ... DiPonio's proffered degree of physical limitation is inconsistent with [Bonneau's] conservative and partially effective treatment history for her physical impairments. [Bonneau's] ... spinal impairments have been at least somewhat responsive to injection therapy and medication adherence. Second, I find that ... DiPonio's proffered degree of physical limitation is inconsistent with [Bonneau's] limited findings upon MRI, x-ray, and physical examination. Studies of [Bonneau's] knees have shown only mild findings, while similar studies of her spine have been moderate and generally stable throughout the period in question. Her examination findings have often shown her to have a normal gait, intact neurological findings, and 5/5 motor strength. Third, I find that ... DiPonio's proffered degree of physical limitation is inconsistent with [Bonneau's] strong range of reported daily activities. The record indicates that [Bonneau] is able to care for pets, attend to personal care tasks, do laundry, load the dishwasher, drive a vehicle, shop for groceries, ... and attend her medical appointments.

See Transcript at 23-24. The ALJ found at step four that Bonneau is unable to perform her past work. At step five, the ALJ found that there is work available for a hypothetical individual of Bonneau's age, education, work experience, and residual functional capacity.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). As a part of making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007).

The regulations governing the consideration of the medical opinions were revised for claims filed on or after March 27, 2017.[2] The new regulations eliminated the "long-standing 'treating physician' rule." See Fatuma A. v. Saul, 2021 WL 616522, 5 (D.Minn. 2021), report and recommendation adopted, 2021 WL 615414 (D.Minn. 2021).[3] The regulations now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

---

[2] Bonneau's applications for disability insurance benefits and supplemental security income payments were filed in June of 2017 and are therefore governed by the new regulations.

[3] The "treating physician" rule provided that the opinions of a treating physician were accorded special deference and were normally entitled to great weight. See Despain v. Berryhill, 9265 F.3d 1024 (8th Cir. 2019). The opinions were given controlling weight if they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. See Id.

> The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (January 18, 2017). ...

See Phillips v. Saul, 2020 WL 3451519, 2 (E.D.Ark. 2020) (Deere, MJ).[4]

Here, the ALJ thoroughly considered the consistency factor. The ALJ explained why DiPonio's medical opinions are inconsistent with the overall evidence as a whole, and the reasons the ALJ gave for so finding are supported by substantial evidence on the record as a whole.

What about the ALJ's consideration of the supportability factor? Bonneau maintains that the ALJ completely ignored the factor. The Commissioner disagrees, taking the position that the ALJ considered the supportability factor in addressing the consistency factor.[5]

---

[4] In Morton v. Saul, 2021 WL 307552, 7 (E.D.Mo. 2021), a district court judge noted that with respect to the supportability factor, "an opinion is more persuasive if it presents more relevant objective medical evidence and explanatory rationale in support of the opinion." With respect to the consistency factor, he observed that "[s]tated more simply, an opinion is more persuasive if it is more consistent with the overall evidence as whole." See Id.

[5] The Commissioner specifically alleges the following: "[t]he ALJ's consideration of [Bonneau's] conservative and partially effective treatment for her physical impairments and her physical examination findings reference ... DiPonio's own findings." See Docket Entry 18 at CM/ECF 15. "As the ALJ discussed ... DiPonio's findings in the decision and cited the effectiveness of treatment and physical examination findings in his reasons for finding [DiPonio's] opinion[s] unpersuasive, the ALJ considered the factor of supportability." See Docket Entry 18 at CM/ECF 16.

There is some appeal to the Commissioner's position. The ALJ's consideration of the overall evidence as a whole was exceptional, and the Court is hesitant to order a remand on the basis of what might be characterized as merely an alternative drafting style or simple failure to use the word "supportability." As Magistrate Judge Deere noted in Phillips v. Saul, though, the new articulation requirements are meant to provide individuals with a better understanding of the Commissioner's determinations and decisions and provide sufficient rationale for a reviewing adjudicator or court. Given those requirements, the Court has difficulty concluding that the ALJ's consideration of the supportability factor involves merely an alternative drafting style or simple failure to use the word "supportability."

If DiPonio's medical opinions do not present more relevant objective medical evidence and explanatory rationale in support of the opinions, the ALJ must explain why. See Walker v. Commissioner, Social Security Administration, 911 F.3d 550 (8th Cir. 2018) (old regulations case) (ALJ must explain with some specificity why he rejected treating physician's opinions). Although the specificity need not be great, the ALJ in this instance provided none. The Commissioner offers several reasons why the opinions are not supported by relevant objective medical evidence and

explanatory rationale. See Docket Entry 18 at CM/ECF 15-16. Although the Commissioner may ultimately prove to be correct, it is the ALJ's responsibility in the first instance, not the Commissioner's, to explain why the opinions are not supported by relevant objective medical evidence and explanatory rationale. In short, the ALJ failed to adequately address the supportability factor as he failed to specifically address whether DiPonio's medical opinions are supported by relevant objective medical evidence and explanatory rationale.

A remand is therefore warranted. Upon remand, DiPonio's medical opinions shall be re-considered. If the ALJ finds them unpersuasive, the ALJ shall explain why, fully addressing the supportability factor, the consistency factor, and any other relevant factors.

The Commissioner's final decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and Melkonyan v. Sullivan, 501 U.S. 89 (1991).

IT IS SO ORDERED this 10th day of March, 2021.

   _____
   UNITED STATES MAGISTRATE JUDGE